UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

| | | |
|---|---|---|
| M.V.B COLLISION INC. d/b/a MID-ISLAND COLLISION, | : | **ECF CASE** |
| Plaintiffs, | : | Docket No.: CV 07 187 (JFB) (MLO) |
| -against- | : | **DECLARATION OF ROBERT JESBERGER** |
| ALLSTATE INSURANCE COMPANY, | : | |
| Defendant. | | |

---

ROBERT JESBERGER, being duly sworn, hereby deposes and says:

1. I am the owner of defendant, Mid Island Collision, and this declaration is being made from both my personal knowledge of the facts of this matter, and my review of files maintained by Mid Island Collision.

2. I have worked in the automobile repair industry for over 35 years, and have owned and operated Mid Island since 1987. Mid Island has become an industry leader in the repair and reconstruction of not only typical steel constructed economy automobiles, but also the high-end of the automobile market, comprised of luxury and foreign automobiles (including hybrids), some of which are constructed with boron, magnesium or aluminum and contain high-end equipment, i.e., multiple airbags and stability control systems. Mid Island is one of only a handful of collision shops throughout the entire country that is Mercedes-Benz certified factory-trained and factory-tooled; i.e., Mid Island's employees are actually trained on, and utilize the same repair tools as are used at the Mercedes-Benz factories. Mid Island is also one of only a handful of collision shops that is certified by BMW, Nissan, Porsche, Toyota, and Lexus.

3. Allstate Insurance Company and its management team have sought, for years, to make an example of Mid Island to other local automobile repair shops, because Mid Island refused to accede to defendants' improper demand that it lower its prevailing repair labor rates, and to accept their unreasonably low and arbitrary rates, for the services it provides to Allstate policyholders who are involved in collisions under their Allstate collision coverage in their policies, and those third parties to whom Allstate is required to pay for the damage caused by its policy holders to third party vehicles.

4. The defendants have continuously and repeatedly retaliated against Mid Island by, among other things, (i) refusing to negotiate in good faith with Mid Island to reach a reasonable labor rate for Mid Island's services and thereby force Mid Island to accept their unreasonably low and arbitrary Labor Rate on a "take it or leave it" basis, as well as failing to negotiate the extent of the claim in violation of New York law (ii) illegally "steering" Mid Island's customers away from Mid Island to Allstate-approved repair shops; (iii) slandering Mid Island to Allstate Insureds with the hope that the insureds will not use Mid Island, but rather take their business to Allstate approved repair shops who have agreed to perform services for all Allstate Insureds at Allstate's unreasonably low and arbitrary Labor Rate; and (iv) illegally declaring repairable automobiles of current and potential Mid Island customers to be "totaled" in order to deprive Mid Island the opportunity to repair them, (v) Establishing a program of Allstate approved repair shops in order to create an artificial fair and reasonable labor rate.

5. The defendants' conduct also has had a far reaching effect on the public at large. Specifically, defendants' conduct directed at Mid Island (i) attempts to compel their insureds to accept inferior work solely to enable defendant to make a profit, (ii) deprives their insureds of the right to use their repair shop of choice pursuant to New York law, (iii) unquestionably delays the

automobile repair process and the payment of claims to their insureds, and (iv) in certain cases forces its insureds to cover costs that legally should be paid by Allstate. Allstate is one of the largest automobile insurance carriers in the United States and is renowned for its strong-armed tactics in pressuring repair shops to accept below-market labor rates, and for underpaying legitimate claims.

6. Upon information and belief, Allstate employees Gary Conwell, John DiGiose, Jim Jarocki, Todd Keith, Peter Martin, John Pluchino, Steve Russo, Joseph Scauzillo, David Seigal, Norman Wong and Allstate Insurance Agents & Brokers, Frank Tinelli, Brad Rosenberg, and Greg Smerechniak, among others, are all present or former employees of Allstate Insurance Company who, between 2003 and 2007, had dealings with Mid Island. Each of the Allstate employees's are licensed by the State, and required by State regulation to negotiate in good faith, and abide by New York State law. Allstate instead (i) consistently pressured Mid Island to accept below-market and patently unreasonable labor rates, (ii) refused to negotiate labor rates in good faith, in violation of Regulation 64, (iii) refused to pay Mid Island for materials and procedures required by manufacturers, and required to bring vehicles back into the pre-accident conditions, and (iv) "totaled" vehicles which were repairable within State and Allstate guidelines, in retaliation for Mid Island failure to cooperate. Instead, Allstate employed (and indeed, still employs) a "take it or leave it" approach to negotiating claims. In the case of the Allstate Insurance Agents & Brokers, Frank Tinelli, Brad Rosenberg, and Greg Smerechniak, by their own admission Allstate has informed them that they are not permitted to send work to Mid Island.

7. On almost every claim between 2003 and 2007 in which an Allstate insured had their vehicle repaired at Mid Island, Allstate - upon information and belief, in contravention of

the New York State law and their own internal policy - would refuse to send payment checks directly to Mid Island, as is generally requested by both the insured and Mid Island at the time that the claims were made, and would instead first hold payment for an indefinite period, and then send it directly to their insured. In fact, this was done even though the customer executed a forms specifically designating Mid Island as their representative, and directing Allstate to pay Mid Island directly. This process caused undue delay both in the claims and repair processes, impeded payment, and inevitably caused harm to both Mid Island and its customers.

8. Mid Island has, for years, tolerated the bullying tactics of Allstate and its employees, as Allstate insureds constitute a significant portion of Mid Island's business. However, when defendant's conduct began seriously impacting our business, we took certain actions to protect it, bringing actions in Nassau County courts as to individual vehicles and insureds, which have unquestionably angered defendants.

9. In virtually all of these cases, the Nassau County courts have found that the Mid Island Labor Rate was fair and reasonable. Notwithstanding these results, and notwithstanding our fair and reasonable labor rates, Allstate continues to engage in an illegal "take it or leave it" posture was in violation of Insurance Law § 2610, and refuses to negotiate in good faith. They have sought as well to make an example of us by engaging in a retaliatory, wrongful and otherwise illegal campaign to put Mid Island out of business and, concomitantly, to discourage other repair shops from refusing to cooperate with Allstate's illegal tactics and practices.

10. Allstate and its management team have repeatedly threatened Mid Island with economic harm and other repercussions if Mid Island continued to aid the defendants' insureds by requesting a fair and reasonable labor rate and if necessary to aid them in litigation against Allstate. Allstate has repeatedly failed to negotiate in good faith; failed to offer a reasonable labor

rate; declared repairable vehicles to be total losses solely in order to deprive plaintiff the opportunity to repair such vehicles regardless of their condition; steered potential and current Mid Island customers away from Mid Island to repair shops of its own choosing, by threatening their own customers and disparaging Mid Island's work; and in many other ways sought to unfairly and improperly deprive us of business.

11. It has been repeatedly relayed to me by both Allstate's insureds and employees, that Allstate adjusters and managers have stated - maliciously and without any basis in fact - that Mid Island "overcharges" customers for its work, that our labor rate is "excessive", that "other shops do better work for less money", that our work is "inferior" to that of Allstate's chosen shops, that Mid Island engages in "extortion" and "price gouging," that Mid Island defrauds its customers, and that Allstate's guarantee is superior to ours, none of which is true. Allstate adjusters repeatedly told customers not to use Mid Island, as they would wind up embroiled in litigation.

12. In addition to the above defamatory and misleading statements, Allstate has repeatedly made efforts to steer insureds and other potential customers away from using Mid Island, often by suggesting their own shops without ever being asked to do so, in direct violation of New York State's insurance law. These illegal and improper efforts by Allstate employees have been reported to us by customers John Aragona, Linda Assaf, David Ayres, Mary Barnes, Thomas Craccollici, Annette Ercolano, Dorothy Groh-Thompsett, Karyn Marquez, Bernard Lanter, Thomas Luthy, Hayden Nadel, Janet Rouse and April Welch, among others. Each of these people was openly told by Allstate adjusters or managers, without ever having asked for a suggested or recommended shop, not to use Mid Island., But to instead use one of Allstate's own shops.

13. Allstate has indicated that all it is required to do to make a "good faith offer" is to offer a dollar amount which another shop would be willing to take in order to repair the customer's vehicle. Until a shop actually inspects a vehicle itself, in person, there can be no possible "good faith offer," as body and mechanical shops in New York have both a right and an obligation under the law to inspect vehicles themselves, and make their own determinations as to what their costs will reasonably be. Upon information and belief, on only one occasion has Allstate ever had personnel from another shop review and inspect a car that was being held at Mid Island in order to attempt to justify the amount of their estimate. In that one instance, both Gary Conwell and Steve Russo inspected a vehicle at Mid Island. We were at a disagreement as to the extent of repairs and labor rate that were required to bring the car back to its pre-accident confition. Gary Conwell informed me that any shop would perform the repair at his estimate. At that time Gary Conwell contacted Finish Line, an Allstate "Pro Shop". Someone from Finish Line came to my shop that day and inspected the vehicle. In my presence, the Finish Line technician informed both Gary Conwell and Steve Russo that in fact they would *not* be able to perform the repairs for the estimate written by Allstate, as there was numerous additional items not included in the estimate that would need to be addressed before any final dollar amount could be determined. In addition I am aware of several vehicles that were moved away from my shop to an Allstate "Pro Shop" because we were unable to come to an agreed price. In every single instance, I came to learn that these vehicle inevitable were repaired for a greater amount than initially estimated by both myself and Allstate, due to damages not addressed by Allstate, requiring multiple supplements from their pro shops.

14. As noted above, one of the tactics used by Allstate against Mid Island between 2003 and 2007 has been to refuse to pay for a variety of procedures and body materials which are

required by the vehicles' manufacturers, and which are required to bring the vehicles back to their pre-accident condition, or in some cases to cap the amounts spent to a ridiculous and improper degree. Among many others, Allstate has consistently refused to pay for bench mounting repairs; sanding on body joints, car covers; celette setup and pull; cutting, trimming and fitting of parts; detailing cars for delivery; feather filling and sanding / prime panels; feather priming and blocking; final sanding, polishing and buffing; mechanical diagnostics; pre-washing and degreasing of vehicles; preparation of raw bumper covers; dealer and markup costs on the resetting of vehicle computers; road testing; self etching primer; spray out test panel; structural damage diagnostics, trial fitting of parts, and welding tests. All of these processes are absolutely required on nearly every vehicle, if we are to do what we are required by law to do, and return them to their pre-accident conditions. These procedures use up expensive materials, and take a tremendous amount of time, between around 11 hours at a minimum, and upwards of 50 or 60 hours of labor, depending on the make and model of the car, and the amount of damage to it. Allstate's refusal to pay for these materials and procedures forces us to either absorb the costs and man-hours ourselves, which loses us a tremendous amount of money, or pass the costs onto our customers.

15. Annexed to this Declaration as Exhibit "1," is a collection approximately 250 lists of the top 18 procedures for which Allstate, from 2003 to 2007, refused to repay Mid Island. These lists constitute a random sampling of Allstate-insured customers, about 50 drawn from each of the five years in question. Each page, representing a single customer identified at the bottom, shows the number of hours spent on each of the 18 procedures, and the amount paid by Allstate, if any. The total income Mid Island lost from these 251 examples is approximately $266,648.80. Note that in the period of time at issue here, Mid Island saw approximately 983

Allstate-insured customers, and each and every one of them involved and required the procedures detailed here. The average loss per customer, extrapolated out to the full 983 Allstate insured customers, totals approximately $1,044,285.94 in lost income from these procedures alone. The full list of all Allstate-insured customers regarding whom Allstate refused to pay for required procedures and materials is annexed hereto as Exhibit "2."

16. The Court should note that in 2008, Allstate in fact began for the first time to pay Mid Island for many of these procedures. For example, they have begun to pay for the wet sand and polish, the clean up, detail and final washing, the self etching primer and epoxy primers, and a number of other procedures the costs of which we previously had to either absorb or pass on to customers.

17. Mid Island has always taken every step that we must take in order to act in good faith with our customers and their insurers. Customers are always informed that should there be a discrepancy between our bill and the amount that their insurance company is willing to pay, that they will be responsible for the difference. However, because we are a service business that relies upon repeat customers to survive, we have on some occasions provided our customers with other options than paying us themselves, for example taking an assignment of their rights to obtain payment form their insurer, including but not limited to Allstate.

18. However, the various means that we have employed to make our customers lives easier in the face of Allstate's defamation and harassment are by no means always successful. Numerous Allstate-insured customers have told me that despite our exemplary service, they would not return to Mid Island in the future, due to Allstate's interference with and delaying of their repair work, defamation of Mid Island, refusal to negotiate fairly, reasonably and in good faith, and refusal to pay a fair and reasonable rate for their work. Mid Island, like any service

provider, relies a great deal on repeat customers in order to stay in business. When Allstate drives our customers away by slandering us, harassing our customers, delaying our work, and depriving our customers of their repairable vehicles, we lose a tremendous amount of potential income, along with the damage to our good name and reputation.

19. A number of individuals who had been long standing customers of Mid Island, who are also Allstate insureds, have told me that due to Allstate's harassment, manipulation and slander, they would not be bringing their vehicles back to Mid Island in the future.

20. Mr. Frank Rio, an Allstate insured had his Mercedes Bence CL 550 repaired at Mid Island Collision. Subsequent to his original repairs, Mr. Rio had another accident with the same vehicle. We have since learned from Mercedes Benz that Mr. Rio told them specifically *not* to have his vehicle repaired at Mid Island, because he did not want to go through with Allstate the same drawn out and stressful process which he had been forced to go through the first time.

21. Ms. Manigault, after having her vehicle successfully steered away from Mid Island by Allstate personnel after it had already been captured, was told by Allstate - falsely -that we had attempted to defraud her, and informed me in person that she would never bring her car back to us, and never again refer a customer to us. Allstate in fact brough fraud charges against us with the DMV in relation to Ms. Manigault's vehicle, but those charges were thrown out. The hearing judge in that matter made it clear that the charges should never have been brought in the first place.

22. Mr. Robinson, who had been a customer of Mid Island for over 30 years, told us after being steered away by Allstate to one of their pro shops that he would not be returning, as he had been told by Allstate - incorrectly - that we had been overcharging him, and that he would

not pay the amounts that Allstate was unfairly and improperly refusing to pay. The pro shop to which he was directed however wrote a supplement on the car, and in the end the repairs cost at least as much, if not more, than we had asked.

23. Ms. Kathleen McNaulty had been a Mid Island customer for years, but after Allstate made efforts to steer her away, delayed her repairs, and refused payment, she informed us that she would not be returning, entirely due to Allstate's harassment.

24. Doroth Groh-Thompsett had her car repaired at Mid Island, but following a dispute with Allstate, she also said she would not be coming back. Allstate would not pay the full amount of repairs, and forced her to make a third-party claim with GEICO, who insured the other vehicle involved in her accident. They paid 100% of the claim, but following this the CarFax Vehicle History Report for her car showed the involvement of two insurers, which seriously diminished the resale value of her vehicle. This treatment caused her to refuse to return in the future, rather than risk further problems with Allstate.

25. Richard Maddox was a long standing Mid Island customer, who brought he step-daughet's car in to Mid Island for repairs, and was told by John DiGiose that he would have to remove the car to one of their pro shops, Masters. He removed the car, and told us that because Allstate did not want him working with Mid Island, and because they told him we had been overcharging, he would not be returning in the future. Masters however wrote a supplement on the car, which caused the repairs there to cost at least as much as, if not more than we were charging.

26. Agnes Priddy was an elderly woman who came to Mid Island with superficial damage to the undercarriage of her Mercedes Benz, caused by running up on a curb. Allstate adjusters Steven Russo and Gary Conwell wrote up the damage for repairs at Mid Island with no

problem. However, Peter Martin then got involved, and the car was subsequently declared a total loss, because though I was willing in that case to accept the dollar value for the repairs set by Allstate, I was not willing to sign off on the estimate, something they require with no other shops to my knowledge. Ms. Priddy and her son informed us of their belief that we must have inflated the damages to cause Allstate to total the vehicle, and stated that they would never return.

27. Frank Tinelli is an Allstate broker, and a personal friend, who repeatedly had referred customers to my shop. In about 2005 he informed me however that John DiGiose of Allstate specifically informed him that he was no longer permitted to send his customers to Mid Island. Additionally, when he himself subsequently had an accident, he did not bring his car to Mid Island as he had done in the past, and informed me specifically that he did not do so due to pressure from Allstate.

28. The above are just a few examples, among many others (Baptiste, Nichols, etc), of formerly loyal customers, turned against Mid Island by Allstate's manipulations.

29. Mid Island has the highest degree of certification available to a body repair shop by Mercedes Benz. Mid Island is also one of only a handful of collision shops that is certified by BMW, Nissan; Porsche, Toyota, and Lexus. No other shop in the northeastern United States has as high a level of certification as Mid Island. Nor does any other shop in the region have as high a degree of training, or as good quality equipment. Simply put, there are no equally qualified shops in the region. Despite our qualifications, Mid Island is competitively priced, comparable to other body shops in Nassau County. We do not overcharge customers; we charge only a fair amount, accepting well below our posted labor rate on most vehicles. We have never performed unnecessary work on any vehicle, have never engaged in illegal or improper "price gouging,"

have never defrauded a customer or an insurer, have never resorted to any of the ridiculous tactics either attributed to us by Allstate or in fact practiced by Allstate.

30. Allstate's improper, illegal and tortious acts against Mid Island, their slander and defamation of Mis Island, their illegal steering and interference with and harassment of our customers, have cause Mid Island millions of dollars in losses, as well as having damaged our name and reputation in our community.

31. The above are only examples of the unfair, improper and illegal attempts by Allstate to improperly steer customers away from Mid Island, to tortiously interfere with our business relationships with our customers and prospective customers, and to mislead and deceive both their insureds and our customers, all in violation of New York's GBL 349, Insurance Regulation 64, Insurance Law 2610, and the common law.

32. Allstate continues to this day to do all it can to maintain its economic stronghold over Mid Island, by "Holding the Line" and continuously underpaying claims, deviating from good and customary standards and practices, and refusing to negotiate claims with Mid Island in good faith, refusing in fact to negotiate claims with Mid Island at all, continuing its "take it or leave it" stance as to their initial and unreasonable estimate amounts.

33. It is thus respectfully requested that the defendant's motion be denied in its entirety.

Robert Jesberger

Sworn to before me this
29th day of March, 2010

Notary Public

DAVID Y. GREENBERG
Notary Public, State of New York
No. 01GR6185299
Qualified in Nassau County
Commission Expires April 14, 2012